### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| **JILLIAN GRATZ** and<br>**TYLER GRATZ,** | | : | **No. 3:19cv1341** |
| | **Plaintiffs** | : | |
| | | : | **(Judge Munley)** |
| | | : | |
| **v.** | | : | |
| | | : | |
| | | : | |
| | | : | |
| **MICHAEL GRATZ,** | | : | |
| | **Defendant** | : | |

**MEMORANDUM**

Before the court for disposition is Defendant Michael Gratz's motion for summary judgment in this case dealing with allegations that he exercised undue influence to procure a change of the beneficiary on a life insurance policy from Plaintiffs Jillian and Tyler Gratz to himself.  The matter has been fully briefed and is ripe for disposition.

**Background**

Lackawanna Medical Group, P.C. ("LMG") purchased $1 million life insurance policies for its principal owners, Dr. Richard Gratz and Dr. Charles Grad.  (Doc. 21, Pls' Second Am. Comp. ¶ 12-13).  Initially, the policies designated LMG as the beneficiary.  (Id. ¶ 12).  Subsequently, LMG changed the policies so that 20% of the life insurance proceeds would be paid to LMG and 80% would be paid to a designated beneficiary of the insured's choosing.  Dr.

Gratz designated his wife, Linda Lee Gratz, as the beneficiary. (Id. ¶ 16).   Linda predeceased Dr. Gratz.  (Id. ¶¶ 18-19).  Dr. Gratz then designated his adult children, the plaintiffs, Tyler and Jillian Gratz, as joint beneficiaries of the $800,000 death benefit.  (Id. ¶ 27).  Subsequently, plaintiffs were removed as the beneficiaries and defendant Michael Gratz, the decedent's brother, became the beneficiary of the life insurance.  (Id. ¶ 45).  It appears undisputed that upon Dr. Gratz's death, defendant received the $800,000 proceeds of the life insurance policy.

A timeline of these events may be useful in understanding the background of this case.  Linda Lee Gratz passed away on June 14, 2015.  (Doc. 44-1, Def.'s Statement of Material Facts (SOF) ¶ 18).  The life insurance beneficiary form which changed the beneficiary from plaintiffs to defendant is dated approximately two years later on July 6, 2017.  (Doc. 44-3, 332-333,[1] Def. Ex. O, Beneficiary Change Form).  Approximately a year and a half after on January 5, 2019, Dr. Gratz passed away.  (Doc. 44-3, 6-8, Def. Exh. B, Obituary).

Plaintiffs then brought the instant case.  They assert that defendant used undue influence on Dr. Gratz to become the beneficiary of the life insurance policy.  According to the plaintiffs, Dr. Gratz' emotional and mental health was

---

[1] References to page numbers in the citation to the record refer to the page number supplied by the court's electronic case filing system in the upper right-hand corner of the heading.

severely compromised at the time due to his wife's illness and subsequent death. (Doc. 21 at ¶ 49).

The second amended complaint, the operative pleading in this matter, contains one count - undue influence in the naming of the life insurance policy beneficiary under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). (Doc. 21, ¶¶ 46-57). Plaintiffs seek judgment in their favor and monetary damages including prejudgment interest and attorney's fees. (Id. *Ad Damnum Clause*).

After the close of discovery, defendant moved for summary judgment. The parties have briefed their respective positions, bringing the matter to its present posture.

**Jurisdiction**

As this matter is brought pursuant to a federal statute, ERISA, 29 U.S.C. § 1001 *et seq.*, the court has federal question jurisdiction. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

**Standard of Review**

Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.'" See Knabe v. Boury

Corp., 114 F.3d 407, 410 n.4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)). "[T]his

standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in

original).

　　In considering a motion for summary judgment, the court must examine

the facts in the light most favorable to the party opposing the motion. Int'l Raw

Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. Anderson,

477 U.S. at 248. A fact is material when it might affect the outcome of the suit

under the governing law. Id. Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the non-movant's burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party

satisfies its burden, the burden shifts to the nonmoving party, who must go

beyond its pleadings, and designate specific facts by the use of affidavits,

4

depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

**Discussion**

Defendant moves for summary judgment on the basis that the plaintiffs cannot meet their burden to establish undue influence.  After a careful review of the law and the record, the court disagrees.

ERISA does not contain a provision regarding undue influence or forged or improperly procured beneficiary designation.  Thus, the courts must apply federal common law or analogous state law to such claims.  Tinsley v. GMC, 227 F.3d 700, 704 (6 Cir. 2000).

Under Pennsylvania law, a dispute over the proper beneficiary of life insurance is reviewed with a burden shifting analysis. The proponent of the beneficiary must first present evidence of the formality of the execution of the change of beneficiary form.  If the proponent does so, then a presumption of lack of undue influence arises. Jackson Nat'l Life Ins. Co. v. Heyser,  No. Civ.A.12-5051, 2013 WL 5278240, at *5 (E.D. Pa. Sep. 19, 2013); Jones v. Steltz, No. Civ.A. 12-2541, 2013 WL 4787219, at *1 (E.D. Pa. Sept. 6, 2013), Estate of Fabian, 222 A.3d 1143, (Pa. Super. Ct. 2019).  The burden of proof then shifts to the party contesting the document to establish, by clear and convincing evidence, a *prima facie* case of undue influence by demonstrating that: (1) the defendant

5

received a substantial benefit from the insurance policy; (2) the decedent was of weakened intellect; and (3) the defendant was in a confidential relationship with the decedent. Id.; Fabian, 222 A.2d at 1150; In re Estate of Clark, 334 A.2d 628, 632 (Pa. 1975). [2]

If the contestant establishes each of these factors, then the burden shifts back to the proponent to demonstrate by clear and convincing evidence the absence of undue influence. Fabian, 222 A.2d at 1150. Notably, the inquiry into the exercise of undue influence is a highly fact-intensive one. Tinsley, 227 F.3d at 705.

## I. Formality of the Execution of the Change of Beneficiary Form

Here, defendant as proponent of the beneficiary change has presented evidence to establish the formality of the execution of the change of beneficiary form. In early July 2017, defendant provided Dr. Gratz with the beneficiary change form that the life insurance company required. (Doc. 44-3, Def. App. Ex. G, Def. Dep. at 67-69; 74-75). Dr. Gratz executed the beneficiary change form that listed defendant as the 80% beneficiary of the life insurance policy. (Def. Ex. G at 77-80; Def. Ex. O, Beneficiary Change Form). The form was submitted to the insurance company. The insurance company in turn sent correspondence to

---

[2] In re Estate of Clark deals with a challenge to a will. Due to the similarity between life insurance and wills, however, the standards for challenging a will are applicable to challenge a life insurance beneficiary designation. Jackson, 2013 WL 5278240 at *5.

Dr. Gratz enclosing a copy of the change of beneficiary form after it had been approved by the company.  (Id.)  The court finds, therefore, that for purposes of this motion defendant has met his initial burden to establish a formally executed beneficiary form.[3]

The burden thus shifts to the plaintiffs to establish undue influence, including a substantial benefit to the defendant, that the decedent was of weakened intellect, and that Dr. Gratz and the defendant shared a confidential relationship.  In Re Estate of Clark, 334 A.2d at 632.  The court addresses these issues *seriatim*.

## II.  Plaintiffs' Burden

### A.  Substantial Benefit

The first factor to examine is whether the defendant received a substantial benefit from the insurance policy.  Fabian, 222 A.2d at 1150.  It appears that defendant did receive a substantial benefit from the life insurance policy.  The parties do not dispute that he received the $800,000 in life insurance benefits.  Accordingly, the court finds that this factor has been established.

---

[3] The parties spend little time addressing this issue.  In their brief, the plaintiffs opine: "The fact that Defendant completed the form designating himself as beneficiary raises the question of whether Dr. Gratz signed the form before or after Defendant filled it out and whether Dr. Gratz fully comprehending that he was changing the beneficiaries from his children to Defendant." (Doc. 57, Pls.' Oppo. Br. at 18).  Plaintiffs have presented no evidence to support this contention or otherwise challenge the formality of the change of beneficiary form.

### B. Weakened Intellect

The next issue for the court to examine is whether plaintiffs have established, or at least raised a genuine issue of material fact, regarding whether the decedent suffered from a "weakened intellect". Id.

Pennsylvania courts have not developed a bright-line test for "weakened intellect." Owens v. Mazzei, 847 A.2d 700, 707 (Pa. Super. Ct. 2004). "The courts have "recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." Id. The element of weakened mentality does not have to rise to the level of testamentary incapacity for purposes of a finding of undue influence. Id.

Here, plaintiffs do not present any evidence that Dr. Gratz suffered from persistent confusion, forgetfulness and disorientation. Rather, they assert that his "compromised and fragile emotional state exacerbated his existing mental and emotional health conditions and rendered him susceptible to manipulation by Defendant." (Doc. 57, Pl.'s Oppo. Br. at 7). They submit several types of evidence to support this point, including the deposition testimony of several witnesses and psychological records.

First, the plaintiffs cite to their own deposition testimony as to their father's behavior after the death of his wife: "[A]t this point my father's behavior was just extraordinarily erratic. I mean he would slap himself, he would scream. He

thought my mother was coming back to life.  He would slam his head against the walls.  He would, you know, talk about taking a knife and just end[ing] it all." (Doc. 56-1, Pl. Tyler's Dep. at 66).

It appears immediately after his wife's death, the decedent "would be up all hours of the morning, seeming completely irrational, screaming, crying.  I remember sounds of him slapping himself or slapping nearby furniture. Pounding on both of our doors in the middle of the night, 2, 3 in the morning . . . wanting to talk . . . He just completely fell apart[.]"  (Doc. 56-2, Pl. Jillian's Dep. at 16).  In the face of this behavior, plaintiffs kept their bedroom doors locked.  (Id.)

Dr. Gratz would periodically talk to his physician partner, Dr. Grad, who also remarked on Dr. Gratz's emotional state.  Dr Grad testified that Dr. Gratz would say, "Linda's got to come back."  (Doc. 56-3, Dr. Grad's Dep. at 30).  Dr. Grad would indicate to Dr. Gratz that she was not going to come back.  Id.  "But there are miracles, there are miracles," Dr. Gratz replied. But Grad insisted, "Rick, someone who's died two years ago isn't coming back.  Okay."  Id.

Decedent's counselor noted on July 24, 2017: " 'Patient states that if God could raise people from the dead and heal people, is there any way he could "resurrect" Linda.  Patient appears to be very serious about his question.' "  (Doc. 56-4, O'Bell Dep. at 86-87).  "He believed that [Linda] could come back in some way, shape or form.  I'm not too sure he believed about a bodily resurrection, but

I think his question, more or less, was, 'Why can't she appear to me?  Why can't she come to me?  Why can't - - you know, you hear of people who go to mediums who, you know, see their loved ones or hear from loved ones beyond the grave.  Why can't she do that to me?  Why isn't she doing that to me?' " (Id. at 87) (internal quotation marks added).

This testimony indicates that the decedent was in a highly emotional state after his wife's death, and a factfinder may take this into consideration to determine whether he suffered from a "weakened intellect" as that term is used for the undue influence analysis.

In addition to this testimony, the plaintiffs point to medical records.  Dr. Gratz began seeing a counselor Jessica Klonoski, MS, HS-BCP, CRC, on March 20, 2017, nearly two years after his wife's death.  (Doc. 56-7, Klonoski Records). Symptoms the decedent reported to Klonoski included:  sleep disturbance; obsessive compulsive tendencies such as getting prayers "exactly right" and obsessively thinking about his deceased wife; hyperarousal, such as a heightened startle response, jolts of anxiety; poor appetite, and having lost fifty (50) pounds; pacing the house crying.  (Doc. 56-7 at 2-3).

Klonoski assessed Dr. Gratz as "struggling with anxious and depressed mood since the passing of his wife in 2015." (Id. at 4).  He reported no active

suicidal ideation but indicated that he would feel "relieved and grateful" if he failed to wake up one morning. (Id. at 3).

After several months, Klonoski referred Dr. Gratz to a male therapist who specialized in complicated grief with an emphasis on spiritual counseling. (Id. at 12). Accordingly, beginning in May 2017, decedent began treating with the new counselor, John O'Bell, LPC. (Doc. 56-5, O'Bell Records at 2).

O'Bell diagnosed decedent with anxiety, major depressive disorder, and obsessive-compulsive disorder. (Id. at 1). Decedent treated with O'Bell until November 2018. (Id. at 2). Plaintiffs point out that O'Bell reported that decedent reported feeling sad, fearful, panicked, and lonely. (Id. at 5-6). Per O'Bell, Dr. Gratz's obsessive-compulsive disorder impacted his whole life, including his relationship with his children and wife. (Doc. 56-4, O'Bell Dep. at 25).

O'Bell further opined that "[Dr. Gratz] appears to be obsessed with his emotional state of loneliness, his compulsion is to pursue relationships based on his needs, not others . . . Patient displays unhealthy patterns of heavier, unhealthy attachment styles (anxious attachment style)." (Id.)

O'Bell further noted that "Dr. Gratz had no relationship with either one of his children, [the plaintiffs] and what I mean by that is what was reported to me by Dr. Gratz was each of his children failed to engage in a relationship with him." (Doc. 56-1, O'Bell Dep. at 29). "Patient states that he continues to have issues

11

with his children; they won't speak to him and only interact with him when they need money." (Doc. 56-5, O'Bell Records at 7).[4]

It is undisputed that the decedent's intellect was not affected and he performed as a physician up to his death. For many years prior to his death he worked nearly every day approximately 70 hours a week. (Doc. 44-1, Def. Statement of Material Facts ¶ 14; Doc. 55, Counterstatement of Material Facts ¶ 14).

When viewed in the light most favorable to the plaintiffs, their evidence establishes that Dr. Gratz suffered from anxiety, depression, and obsessive-compulsive disorder. He was severely mentally distressed after the death of his wife. He also had trouble with relationships with others. A factfinder could conclude that these mental health concerns could have left Dr. Gratz in a weakened intellect and subject to undue influence.

Accordingly, as a matter of law, the plaintiffs have presented sufficient evidence from which a factfinder could conclude the Dr. Gratz suffered from "weakened intellect" in the undue influence context, and the court will proceed to the next element of the undue influence analysis.

---

[4] Plaintiffs' position, as discussed more fully below, is that defendant attempted to foster contention between Dr. Gratz and themselves.

## C.  Confidential Relationship

This next factor in the undue influence analysis is whether a "confidential relationship" existed between the defendant and the decedent.  Fabian, 222 A.2d at 1150.  After a careful review, the court finds that the plaintiffs have submitted sufficient evidence for a factfinder to conclude that a "confidential relationship" existed between Dr. Gratz and his brother, the defendant.

A confidential relationship exists in the "undue influence" context where "the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed."  In re Clark's Estate, 334 A.2d at 633 (internal quotation marks and citation omitted).  Additionally,

> [t]here is no precise formula for finding a confidential relationship, but generally it will be found when one justifiably reposes his trust in the hands of another who possesses some overmastering influence. This trust is given with confidence that it will be used in the testator's best interests.

Burns v. Kabboul, 595 A.2d 1153, 1163 (Pa. Super. Ct. 1991) (quoting Estate of Cooper, 506 A.2d 451, 453 (Pa. Super. Ct. 1986).  "A confidential relationship is created between two persons when it is established that one occupies a superior position over the other—intellectually, physically, governmentally, or morally— with the opportunity to use that superiority to the other's disadvantage."  In re

13

Estate of Thomas, 344 A.2d 834, 836 (Pa. 1975). "[S]uch a relationship is not confined to a particular association of parties but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." Estate of Keiper, 454 A.2d 31, 33 (Pa. Super. Ct. 1982) (quoting Silver v. Silver, 219 A.2d 659, 662 (Pa. 1966)).

The Pennsylvania Supreme Court has explained that:

> [t]he concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line.  The court has recognized, nonetheless that the essence of such a relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other.  Accordingly, a confidential relationship appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, *or*, on the other, weakness, dependence or trust, justifiably reposed.

Basile v. H&R Block, Inc., 777 A.2d 95, 101 (Pa. Super. Ct. 2001) (internal quotation marks and citations omitted; emphasis in original).

Here, the defendant is the older brother of Dr. Gratz.  The fact that they were brothers does not automatically give rise to a "confidential relationship." The law provides that:

> [t]he fact of kinship between proponent and decedent does not alone establish a confidential relationship. In Stewart v. Hooks, 372 Pa. 542, 550, 94 A.2d 756, 760, it was said: 'In reviewing will contests we have frequently decided that persons in close family relation enjoyed no confidential relation. See: Leedom v. Palmer, 274 Pa. 22, 117 A. 410 (brother and sister); Aggas v. Munnell, 302 Pa. 78, 152 A. 840

14

(father and daughter); In re Cookson's Estate, 325 Pa. 81, 188 A. 904
(mother and daughter); In re Royer's Estate, 339 Pa. 423, 12 A.2d
923 (mother and son); In re Cressman's Estate, 346 Pa. 400, 31 A.2d
109 (husband and wife)'. See also: Farmer Will, 385 Pa. 486, 491,
123 A.2d 630.

Kerry v. O'Donovan, 134 A.2d 213, 218 (Pa. 1957).

Regarding confidential relationships Pennsylvania law further provides that

"[t]he essence of such a relationship is trust and reliance on one side, and a

corresponding opportunity to abuse that trust for personal gain on the other." Id.

Accordingly, "[a confidential relationship] appears when the circumstances make

it certain the parties do not deal on equal terms, but, on the one side there is an

overmastering influence, or, on the other, weakness, dependence or trust,

justifiably reposed [.]" Frowen v. Blank, 425 A.2d 412, 416–17 (Pa. 1981).

Plaintiffs bear the burden to establish, by clear and convincing evidence, a

"confidential relationship" existed between their father and their uncle, the

defendant. Fabian, 222 A.2d at 1150.  That is, they must present evidence that

the defendant held a superior position over Dr. Gratz intellectually, physically,

governmentally, or morally, including the opportunity to use that superiority to

their decedent's disadvantage.  In re Estate of Thomas, 344 A.2d at 836.  Such a

determination is highly fact sensitive and both parties have submitted much

evidence in support of their respective positions.

15

For example, Plaintiff Tyler Gratz testified at his deposition that: "After my mom passed … [the defendant] became a very leading figure in my father's life." (Doc. 56-1, Tyler Gratz Dep. at 75). Being a "leading figure" in Dr. Gratz' life could be evidence that defendant was in a position to have the type of superiority that he could use to his benefit over Dr. Gratz.

Moreover, the plaintiffs' brief states: "[Plaintiff] Tyler [Gratz] explained that Defendant had a unique ability to manipulate Dr. Gratz that would become progressively more devious when Defendant had something to gain." (Doc. 57, Pls.' Oppo. Br. at 17).   For the first example of the defendant's unique ability to manipulate Dr. Gratz, Plaintiff Tyler Gratz described defendant buying Dr. Gratz cheap watches from vendors in New York.  He would then give them to Dr. Gratz for birthday or holiday gifts and indicate that they were expensive brand name watches. Dr. Gratz would not believe that they were inexpensive watches as he believed his brother would never lie to him.  (Doc. 56-1, Tyler Gratz Dep. at 78).

The other example Tyler provided is something that happened when he was a child.  (Id. at 78).  He did not know the specifics, but it was something about money his father and brother were supposed to split, and his father never got his share.  (Id. at 79).  This anecdote, which is somewhat vague, could be evidence for the plaintiffs to use to establish a confidential relationship.

Plaintiffs also argue that defendant attempted to foster a contentious relationship between Dr. Gratz and the plaintiffs.  Their brief indicates that "[defendant] would seize every opportunity to dismiss and degrade" positive interactions between Dr. Gratz and  his children.  (Doc. 57, Oppo. Br. 20). Plaintiff Tyler Gratz' deposition indicates that he overheard the defendant telling Dr. Gratz that Tyler was only interested in money and did not care about him (Dr. Gratz).  (Doc. 56-1, Tyler Dep. at  52).  At one of Dr. Gratz' counseling sessions, Tyler indicates that defendant said that Dr. Gratz needed to get his children out of his life and out of his house.  (Id. at 77).  It was difficult to get Dr. Gratz to open up at the session because defendant would whisper to him after every answer. (Id.)  Per Tyler Gratz, defendant would tell Dr. Gratz to take away money from the plaintiffs, to kick them out of the house and to not pay for their car insurance. (Id. at 80, 85).  Defendant let it be known that he was in favor of Dr. Gratz leaving nothing to his children according to Plaintiff Tyler.  (Id. 81).

When viewed in the light most favorable to the plaintiffs, the evidence establishes that defendant had a close personal relationship with Dr. Gratz, and perhaps he did try to drive a wedge between him and his children.  Such evidence may help establish that Dr. Gratz and defendant had a confidential relationship.

17

Further, plaintiffs claim that defendant "was frequently at Dr. Gratz's place of employment with no legitimate business reason to be there." (Doc. 57, Pls'. Opp. Br. at 19).  For this assertion, plaintiffs cite to defendant's own deposition. In his deposition, defendant stated that "I'm there a lot[,]" regarding LMG.  But rather than indicating he had no business reason to be there, he stated he was there for business. He states, and plaintiffs do not address, that:  "I'm there a lot. They're all my clients."  (Doc. 56-11, Def. Dep. at 163).  It is not exactly clear, what period of time defendant refers to.  However, it does raise an issue as to defendant being at Dr. Gratz's place of employment often, and whether or not there was a legitimate business reason to be there is contested.

With regard to the counseling sessions, it is not contested that defendant attended some of them with Dr. Gratz.  Indeed, defendant may have attended a great many of the sessions with Dr. Gratz.  This evidence is thus relevant as to the relationship between the two brothers.

To attempt to demonstrate a confidential relationship between defendant and Dr. Gratz, the plaintiffs also point out that defendant recommended an attorney to Dr. Gratz.  That attorney assisted Dr. Gratz in his estate planning and drafted his will.[5]

---

[5] In support of his motion for summary judgment, defendant has submitted a declaration by the attorney discussed here, Frank J. Bolock, Jr.  The declaration indicates that Dr. Gratz told him that his children were often mean and hurtful to him and often refused to talk to him.  Further,

Additionally, plaintiffs seek to establish that Dr. Gratz was dependent on the defendant. Potentially, a dependency could be relevant to a finding of a confidential relationship. Plaintiffs' brief states that "Grad [decedent's medical partner] testified that Dr. Gratz was 'dependent' upon Defendant after the death of Linda [Gratz]." (Pl. Oppo. Br. at 12). Specifically, Dr. Grad's testimony was: "[Decedent] had - - he had developed dependency. He certainly had a dependency on [his wife] Linda, and his brother [the defendant] probably to some extent." (Doc. 56-3, at 3, Dr. Grad Dep.). This testimony also goes toward establishing the relationship between the two brothers.

The plaintiffs also point out that defendant helped Dr. Gratz with household chores such as weekly laundry, making his bed, doing minor house maintenance, and buying clothing. (Doc. 44-3, Ex. G., Def. Dep. at 112-13). On the other hand no evidence has been presented that defendant paid Dr. Gratz's bills or had anything to do with his finances. (See, e.g., id. at 113 (indicating defendant never helped Dr. Gratz with his bills or finances)).

The Pennsylvania Superior Court has explained that: "The clearest indication of a confidential relationship is that an individual has given power of

---

Dr. Gratz considered disinheriting his children entirely. He also felt, according to Attorney Bolock, very strongly about designating his brother as the beneficiary of the life insurance at dispute here. (Doc. 44-3, Def. Ex. P, 335-337). Plaintiffs have moved to strike this declaration based on attorney-client privilege. (Doc. 46). The court need not rely on this evidence in making its decision as rather than establishing a fact it only helps to create questions of fact. Accordingly, the motion to strike will be denied as moot.

attorney over her savings and finances to another party." In re Estate of Fritts, 906 A.2d 601, 608 (Pa. Super. Ct. 2006).  Here, plaintiffs have highlighted no evidence that Dr. Gratz gave power of attorney to the defendant or that the defendant had any authority whatsoever in the decedent's financial matters.  The record does appear undisputed, however, that Dr. Gratz signed the change of beneficiary form provided to him by defendant and then returned it to the defendant to take care of.  This evidence may indicate a certain level of trust that Dr. Gratz had in the defendant.

Based upon all of this evidence, it appears that whether plaintiffs will establish a confidential relationship or whether defendant and Dr. Gratz merely had a close personal relationship is a question for the factfinder.  See Weir by Gasper v. Estate of Ciao, 556 A.2d 819, 826 (Pa. 1989) (finding a close personal relationship between a father and a son as opposed to a confidential relationship).[6]

## III.  Absence of Undue Influence

The court has found that the plaintiff has raised a question of fact with regard to whether Dr. Gratz suffered a weakened mental state and whether he

---

[6] The plaintiffs have submitted several declarations in support of their motion for summary judgment.  The defendant has moved to strike these declarations in whole or in part. (Doc. 63). The court has not needed to rely on these declarations in making its decision that plaintiffs have raised genuine issues of material fact.  Accordingly, the motion to strike will be denied as moot.

and defendant shared a confidential relationship.  Thus, the burden shifts to the defendant to demonstrate by clear and convincing evidence the absence of undue influence.  Fabian, 222 A.2d at 1150.  The bulk of this memorandum has thus far addressed the evidence in the light most favorable to the plaintiffs. Defendant, however, has presented evidence which counters the evidence of the plaintiffs.  Important to the defendant's case is his own testimony as to how and why the change in beneficiary was made.  Thus, credibility of the defendant, the plaintiffs, and the other witnesses will be important to this case.  As credibility is at issue, summary judgment in favor of the defendant regarding the absence of undue influence is inappropriate.

**Conclusion**

For the reasons set forth above, the court finds that summary judgment should not be granted.  Plaintiffs have raised questions of fact with regard to whether their father, the decedent, suffered from a weakened intellect and whether he and the defendant had a confidential relationship.  An appropriate order follows.

Date: 7/31/24

JUDGE JULIA K. MUNLEY
United States District Court

21